UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMERICAN EQUITY MORTGAGE, INC., | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 4:06CV1167 CDP ) |
| FIRST OPTION MORTGAGE LLC, | ) ) ) ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

American Equity Mortgage, Inc. seeks injunctive relief against First Option Mortgage, LLC, which recently opened a competing branch in the Indianapolis area with seven former American Equity employees. The former employees had signed agreements not to compete in the Indianapolis area for a year after leaving the company. American Equity alleges that First Option has tortiously interfered with those contracts by hiring the employees and by using American Equity's confidential information. Applying the Dataphase factors, I find that American Equity is not likely to succeed on the merits of its case and that there is insufficient threat of irreparable harm. Although the equities are equally balanced and the public interest favors the enforcement of valid contracts, I conclude that preliminary injunctive relief is inappropriate here.

## Background

Plaintiff American Equity Mortgage, Inc. ("AEM") and defendant First Option Mortgage, LLC ("FOM") are competitors in the business of originating residential real estate loans, including home mortgage refinancing. AEM is a Missouri corporation with its principal place of business in St. Louis, Missouri. AEM transacts business in more than twenty states and maintains more than thirty branch offices. On or about August 1, 2004, AEM acquired the assets of Integrity Mortgage Corporation. As part of that acquisition, AEM acquired seven branch offices, including a branch in Indianapolis, Indiana. FOM is a Georgia limited liability company with members who are citizens of Georgia and Texas. FOM operates approximately eight branch locations. In August of 2006, FOM opened a branch in Indianapolis. As a result of that opening, AEM and FOM are now direct competitors in the Indianapolis area.

AEM has been highly successful in the business of originating residential real estate loans, and 2005 was a good year for the Indianapolis branch. In early to mid 2006, however, income generated by the Indianapolis office began to fall. The parties dispute the reason for this drop in business, and the evidence showed multiple, interrelated reasons. Whatever the cause of the decreased business, one of the results was that many of the branch employees began seeking new employment.

Joshua Fitzwater was the manager of the AEM Indianapolis branch from June 2005 until his resignation in July 2006. He began looking for a new job in early 2006, but did not start talking with FOM until June. AEM alleges that FOM, through the actions of one of its members, Tim Burford, systematically targeted key AEM employees, soliciting them to leave AEM and work for FOM. The only evidence presented, however, showed that it was Fitzwater who initiated contact with Burford, not the other way around. FOM had no plan to open an Indianapolis branch until Fitzwater contacted Burford in June of 2006.

Correspondence between Fitzwater and Burford indicates that they had reached a tentative agreement for Fitzwater to become president of a new FOM Indianapolis branch by mid-June 2006. On July 18, 2006, Burford internally announced that Fitzwater would be president of FOM's soon-to-be Indianapolis branch. On the same date, Fitzwater tendered his resignation to AEM. AEM asked Fitzwater to continue working until July 28, 2006, which he did. In June and July, loan officers at the AEM Indianapolis branch asked Fitzwater about potential employment with FOM. Fitzwater referred the employees to the FOM website and told them to contact Burford. The new FOM Indianapolis branch officially opened for business on August 14, 2006, with Fitzwater as branch president and six former AEM employees as loan officers.

AEM had required the employees to sign agreements not to compete. The agreements prohibit the use and disclosure of confidential business information, temporarily restrict certain competition, and temporarily restrict solicitation of employees, customers and prospective customers. Fitzwater signed such an agreement, as did all of the other AEM loan officers who went to work at FOM.[1] However, there is a long history of former AEM employees leaving AEM to work for competing mortgage companies without enforcement of the non-compete agreements by AEM. In fact, many of the loan officers involved here were told by Eric Meadow, Chief Operations Officer of AEM, that AEM does not sue employees when they leave.

AEM filed its single count complaint on August 3, 2006, alleging tortious interference with contract. I denied AEM's request for a temporary restraining order on the same day, and it now seeks a preliminary injunction. The Court conducted an evidentiary hearing on AEM's motion on September 26, 2006, and October 3, 2006.

---

[1] The parties dispute whether the Agreement Not to Compete that was signed by loan officer Brandon McDonald is valid since McDonald signed the agreement, left AEM for other employment, and then became re-employed with AEM and did not sign a new Agreement. I need not resolve this dispute to decide whether to issue a preliminary injunction.

## Discussion

In order to determine whether preliminary injunctive relief should be granted, I must apply the familiar four-factor test: (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties to the litigation; and (4) the public interest. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981).

It is not likely that AEM will succeed on the merits in this case, nor has AEM shown that irreparable harm will result if an injunction does not issue. The harms are equally balanced, and the public interest favors neither side. No single factor in the Dataphase test is determinative. Id. Overall, I conclude that the preliminary injunction requested by AEM should not issue.

## AEM is Unlikely to Succeed on the Merits

Under Missouri law, a claim of tortious interference with a contract consists of the following elements: (1) a valid contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from the defendant's conduct. Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n, 796 S.W.2d 369, 372 (Mo. 1990) (en banc) (citation omitted).

FOM argues that the non-compete agreements signed by the AEM employees are invalid because they contain restrictions that are too broad to justify protecting AEM's legitimate business interests. At the hearing, FOM also argued that changes at AEM's Indianapolis branch to marketing, company name, company spokesperson, and income arrangements constituted such significant alterations to the terms and conditions of employment that the non-compete agreements are no longer enforceable. I am not particularly persuaded by these arguments, but I do not have to decide this issue. Even assuming the contracts are valid, I find that AEM has not shown a likelihood of success on the merits of two of the other elements of tortious interference: intentional interference and absence of justification.

The evidence before the Court indicates that AEM is unlikely to prove that FOM intentionally interfered with AEM's employee contracts by inducing or causing the employees to breach the contracts. AEM has made a strong case for violation of the duty of loyalty and breach of contract by Fitzwater and other former AEM loan officers. However, this suit was not brought against Fitzwater – it was brought against FOM. AEM must prove that FOM caused or induced the AEM employees to breach their contracts. There is no indication that AEM will succeed in making such a showing.

In order to determine whether FOM's actions caused the breach, the "but for" test is applied. Ozark Employment Specialists, Inc. v. Beeman, 80 S.W.3d 882, 894 (Mo. Ct. App. 2002) (citing Fabricor, Inc. v. E.I. DuPont de Nemours & Co., 24 S.W.3d 82, 93 (Mo. Ct. App. 2000)). "A two-step process is used to determine whether the 'but for' test has been met: 1) did the defendant actively and affirmatively take steps to induce the breach; and, if so, 2) would the plaintiff's business expectancy [have] been realized in the absence of the defendant's interference?" Id. (citing Fabricor, 24 S.W.3d at 93-94).

There is no indication in the record that AEM can even establish the first step in the "but for" test. FOM did not initiate talks with Fitzwater or any other AEM Indianapolis employee. FOM had no plan to open a branch office in Indianapolis and knew nothing about the Indianapolis market until Fitzwater contacted Burford. The depositions of loan officers Nicole Lidester, Jarad Vinup, Brandon McDonald, and John Davis all indicate either that they approached Fitzwater about FOM employment and were referred to the FOM website or were given Burford's number, or that they got the same information from a fellow loan officer. No loan officer testified that she or he was approached or induced by Burford, Fitzwater or any other FOM employee regarding employment.

AEM has no evidence to the contrary. Deanna Daughhetee, AEM's president and sole shareholder, admitted that there is high turnover among AEM loan officers and that several AEM loan officers have gone to work for competing mortgage businesses in the past. Despite allegations that FOM systematically targeted AEM employees, neither Daughhetee nor any other AEM witness could provide any direct evidence that FOM solicited any AEM employees. Daughhetee stated that other AEM managers had told her of such solicitation, but AEM did not present any non-hearsay testimony to confirm this hearsay. Daughhetee testified that a whole branch would not leave without inducement, but I find it just as likely to have occurred the way FOM alleges: Fitzwater decided to leave and the other employees followed him because they too were unhappy at AEM. There is no evidence that FOM actively or affirmatively took any steps to induce the AEM employees to breach their non-compete agreements. Based on this evidence, I conclude that AEM is not likely to succeed on the merits of proving intentional interference.

Alternatively, AEM has not shown it is likely to succeed in establishing an absence of justification for FOM's actions. Missouri law "recognizes that intentional interference with plaintiff's business expectancies may be 'justified' if defendant's aim is 'to protect its valid economic interests.'" SuperTurf, Inc. v.

Monsanto Co., 660 F.2d 1275, 1286 (8th Cir. 1981) (quoting Salomon v. Crown Life Ins. Co., 536 F.2d 1233, 1242 (8th Cir. 1976)). In Missouri, justification exists if the defendant has an economic interest in the outcome of the business relationship so long as the defendant does not employ improper means in causing the interference. Alternate Fuels, Inc. v. Cabanas, 435 F.3d 855, 858 (8th Cir. 2006) (citation omitted). Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law. Community Title, 796 S.W.2d at 373.

The evidence does not show that AEM is likely to succeed in proving that FOM used improper means or that its actions were otherwise without justification. FOM had the right to hire employees for its new Indianapolis branch. As set out above, the evidence does not show that FOM used wrongful means to induce the AEM employees to leave their current positions or to induce AEM employees to take customer lists with them when they joined FOM.

AEM does not assert that FOM made any threats, or committed any acts of violence, trespass, defamation, misrepresentation of fact, or restraint of trade. AEM fails even to address the improper means issue in its briefs. AEM's only statement

on point is that "Fitzwater and other former employees did not have a legal right to act in the manner described." But, as stated above, this tortious interference claim is being brought against FOM, not against the former employees. Although Fitzwater and the other loan officers may not have had a legal right to breach their non-compete agreements, FOM had no contract with AEM. FOM had a legal right to hire Fitzwater and the loan officers as employees in its Indianapolis branch. Moreover, AEM's past practices of not suing employees who left the company and went to work for competitors suggests that FOM had no reason to believe there was a problem with hiring former AEM employees.

The evidence presented at this stage of the case, of course, is limited to the testimony and documents that the parties have provided to me, and the reasonable inferences that I can draw from them. Perhaps a full record might lead to a different conclusion, but for purposes of this preliminary injunction, the record before me is insufficient to show that AEM is likely to succeed on the merits of its tortious interference claim.

## **AEM has not Established a Threat of Irreparable Harm**

AEM argues that its former employees have misused and improperly distributed AEM's confidential and customer information to the benefit of FOM. According to AEM, the lost earnings resulting from use of its confidential

information by a direct competitor cannot be accurately predicted and therefore there is no adequate remedy at law.  FOM asserts that AEM cannot show any damages, but if there were any lost profits, monetary damages would be ascertainable through business records and an expert accountant.

AEM has not established that it is facing irreparable harm.  Many AEM employees have left the company to work for competitors in the past and despite AEM's knowledge of their new positions, it has not brought legal action against them.  This past practice by AEM suggests that enforcement of non-compete agreements is not always necessary in order to protect trade secrets and that harm from such inaction is not irreparable.  In an attempt to explain AEM's change in behavior, Daughhetee testified that FOM had never before tried to hire away a whole branch.  She called FOM's actions an 'orchestrated raid' on the AEM Indianapolis branch, and said that such actions are representative of a trend by FOM of recruiting and hiring AEM employees, targeting AEM customers, and taking AEM's proprietary information.  The evidence, however, did not support Daughhetee's conclusions, and the evidence did not support the argument of irreparable harm.

In addition, the evidence suggests that the employees who left AEM for FOM were all unhappy and seeking new employment before considering FOM. Daughhetee admitted that there is fairly high turnover with loan officers. Irreparable harm does not necessarily result from the loss of multiple at-will employees. Issuing an injunction would not cure this harm, because the employees would probably not go back to work at AEM.

AEM also alleges irreparable harm from use of its confidential information, including customer lists. The evidence in the record does not show that this is a valid threat. The parties jointly submitted a list of overlapping customers, that is, customers whose credit reports had been pulled by AEM in the past and whose credit has also been checked by the FOM Indianapolis office since its opening. Although some customers appeared the same based on their names, the addresses and social security numbers did not match for most of them. Of the customers who could be matched with some certainty, only two have loans in progress or closed loans with FOM, and both of those customers had previously withdrawn their applications from consideration at AEM. All of the loan officers testified that they did not take customer lists from AEM and that FOM has repeatedly warned them that calling on AEM customers is unacceptable. If damages are established in a trial on this matter, monetary relief will be an adequate remedy and therefore injunctive

relief is inappropriate.

## The Harm to the Parties is Equally Balanced

The balance of harms factor of the Dataphase test supports neither party in this case. Although, AEM would suffer great harm from the illegal use of its confidential information by former employees, there is little evidence that this is happening. On the other hand, the issuance of an injunction against FOM and the resulting shut down of its Indianapolis branch would cause significant harm to FOM as well.

In granting equitable relief such as a preliminary injunction, the Court considers the actions of both parties. Although there is strong evidence to suggest that Fitzwater and other loan officers violated their duty of loyalty to AEM, the evidence also indicates inequitable action by AEM. Eric Meadows, Chief Operations Officer of AEM, admits to having told some of the AEM loan officers in a mid-July 2006 meeting, before any of them had tendered their resignations, that AEM does not sue employees for leaving. AEM concedes that Meadows made the statement, but now argues that saying AEM would not sue them 'for leaving' was not an assurance that AEM would not sue them if they went to work for a competitor. At the very least, Meadow's statement was misleading. The balance of equities favors neither party in this case.

## **The Public Interest Supports the Enforcement of Valid Contracts**

Although I have made no ruling on the validity of the non-compete agreements at issue in this case, in general, the public interest benefits from the enforcement of valid contracts and the punishment of parties who breach such agreements. The public interest does favor AEM, and this factor would be very important if AEM were seeking injunctive relief against the former employees. The public interest does not favor AEM in its claim against FOM, however, because there is no evidence that FOM violated a contract or induced a violation.

## **Conclusion**

I will deny the preliminary injunction that American Equity Mortgage requests. Development of a further record, of course, may change the result at trial, but based on the evidence now before me, I do not find American Equity Mortgage is likely to succeed on the merits of a tortious interference claim nor do I find there to be a threat of irreparable harm.

By separate order I will refer this case to mediation. The parties have conducted extensive discovery already, and they certainly know enough of the evidence to engage in meaningful settlement discussions. If the mediation fails I expect the case can be ready for trial on the merits relatively quickly, and so I will set a scheduling conference to be held shortly after the deadline for completing

mediation.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for a preliminary injunction [# 3] is DENIED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of October, 2006.